### S. Blaidsell, Jr., Company v. Citizens National Bank of Tyler.

#### No. 1227. Decided June 22, 1903.

**1.—Bill of Exchange—Bill of Lading—Assignee—Acceptance—Failure of Consideration.**

A bank purchasing from the shipper his draft on the consignee for the price of cotton shipped under contract of sale, secured by the assignment of the bill of lading therefor, to shipper's order, attached to it, does not, it being accepted and paid, assume the obligations of the drawer to the drawee, nor become liable to the latter in case the property, coming to his hands after his payment of the draft, is short in weight of the amount called for in the bills and for the price of which the draft was drawn. (Landa v. Lattin, 19 Texas Civ. App., 246, disapproved.) (Pp. 631-633.)

**2.—Same—Pleading—Conclusion.**

An allegation that the bank, by purchasing the draft, with assignment of the bill of lading of the property for the price of which it was drawn, attached to and securing it, became the owner of the property and assumed the relation of seller thereof to the person on whom the draft was drawn, was a mere conclusion of the pleader, not to be taken as an averment that the transaction was other than an ordinary purchase of a draft secured by bill of lading attached. (P. 633.)

Question certified from the Court of Civil Appeals for the First District, in an appeal from Smith County.

*W. S. Thomas* and *J. O. Mahaffey,* for appellant.—The transfer of a bill of lading for value transfers the title to the property covered by it;

and a bank which by such transfer to it of a bill of lading acquires the right to property shipped in fulfillment of a contract of sale can enforce against the purchaser no greater right than that possessed by the seller. And where a vendor of cotton in Texas sold to a purchaser in Massachusetts a number of bales of cotton at a given price per pound, and shipped the same from a point in Texas to the purchaser in Massachusetts, and took from the carrier a bill of lading to shipper's order and attached thereto a draft drawn in the seller's favor upon the buyer for the purchase money and afterwards sold, transferred and indorsed said draft and said bill of lading to a bank for value, and the bank forwarded the same with draft attached and delivered the bill of lading to the purchaser upon payment by him of the full purchase price, and this before the purchaser did or could have weighed said cotton, and the cotton turns out short in weight, then the bank is liable to the purchaser for any loss or damage he thus sustains by reason of said shortage in weight. Landa v. Lattin Bros., 19 Texas Civ. App., 246; Finch v. Gregg, 49 Law. Rep. Ann., 679.

By acquiring from White & Co. both the bills of lading and the drafts, the bank as before stated became the owner of all their rights and benefits in the contract made by them with appellant; became invested with the right to carry out and enforce the contract with appellant upon the same and no other terms than those agreed between White & Co. and appellant. By this it necessarily follows that appellee bank became an equitable assignee of the contract made with appellant. This it seems follows as logically as the truth that the shadow follows the substance. If the bank became the equitable or legal assignee of the contract and attempted to perform it, can it be denied that if it attempted to carry it out, and failed, though it received compensation for full performance, that it should be compelled to make restitution for its failure? To deny this surely is to deny the existence in the law of that measure of justice which it accords.

*Gregory & Batts, Marsh & McIlwaine,* and *Fiset & Miller,* for appellee.—The transfer of a draft with bill of lading attached gives to the transferee a limited and qualified interest in the property covered by the bill of lading, this property being to secure the indorsee of the draft in its payment. Colebrooke on Collateral Security, secs. 382, 383; Lee v. Bowen, 5 Biss., 154; Halsey v. Warden, 25 Kan., 136; First National Bank of Cairo v. Crocker, 111 Mass., 163; Bank of Rochester v. Jones, 4 N. Y., 497; De Wolf v. Gardner, 12 Cush., 19, 14; National Bank of Green Bay v. Dearborn, 115 Mass., 223; Hathaway v. Haynes, 124 Mass., 313; Davenport National Bank v. Homeyer, 45 Mo., 149; Bank v. Luttgen, 29 Minn., 363, 13 N. W. Rep., 151; Holmes v. Bailey, 92 Pa. St., 57; Emery v. Bank, 25 Ohio St., 360; Hoffman v. Bank, 12 Wall., 181.

The purchase or discount of a draft with bill of lading attached by the indorsee of the contract between the drawer and drawee does not

make the indorser the guarantor of drawer upon the contract between the consignor and consignee. Tolerton & Stetson v. Anglo-California Bank, 50 Law. Rep., Ann., 777; Goetz v. Bank, 119 U. S., 551; Hoffman v. Bank, 12 Wall, 181; Atlanta Bridge and Axle Co. v. Bank of Rome, 15 S. E. Rep., 303.

The indorsee of the draft with bill of lading attached can enforce against the drawee, prior to acceptance, the contract between the drawer and drawee only so far as it might have been enforced by the drawer; upon acceptance, however, of the draft the acceptor becomes the obligor upon a new contract with the indorsee and the obligation may be enforced, notwithstanding the partial or complete failure of the original consideration, and if the draft be paid the drawee can not recover from the indorsee for value to whom the payment was made. Jarvis v Wilson, 46 Conn., 92; Fisher v. Beckwith, 19 Vt., 31; Arnold v. Sprague, 34 Vt. 402; United States v. Bank of Metropolis, 15 Pet., 377; Grant v. Ellicott, 7 Wend., 227; First National Bank of Quincy v. Ricker, 71 Ill., 439; Johnston v. Commercial Bank, 27 W. Va., 343; National Park Bank v. Ninth National Bank, 46 N. Y., 77; Goddard v. Merchants Bank, 4 N. Y., 149; Bernheimer v. Marshall, 2 Minn., 178; Hoffman v. Bank of Milwaukee, 12 Wall., 181; Bank of the U. S. v. Bank of Georgia, 10 Wheat., 333; Craig v. Sibbett, 15 Pa. St., 238.

WILLIAMS, Associate Justice.—The Court of Civil Appeals for the First District have certified for decision the case stated as follows:

"In this cause now pending before this court on motion for rehearing the trial court sustained a general demurrer to the plaintiff's petition, and the latter, refusing to amend, has appealed. The petition is as follows:

" 'Now comes the S. Blaisdell, Jr., Company, plaintiff, complaining of Newell W. White and A. Hicks, who compose the firm of Newell W. White & Company, both as individuals and as a firm, and the Citizens National Bank of Tyler, defendants, and leave of the court first had and obtained, files this its first amended original petition in lieu of and amending its original petition filed herein on the 6th day of May, 1901, and so amending respectfully shows and represents to the court as follows, to wit:

" 'First. That the plaintiff is a private corporation duly incorporated under the laws of the State of Massachusetts, and having its place of business in the city of Chicopee, in the county of Hampden, in the said State. And the defendant Newell W. White and A. Hicks are resident citizens of Smith County, Texas, and are and have been since prior to the first day of October, 1900, partners in trade under the firm name of Newell W. White & Company, and that the defendant, the Citizens National Bank of Tyler, is a private corporation, duly incorporated under the laws of the United States of America, with its place of business in the city of Tyler, Smith County, Texas, of which J. W. Wright,

whose residence is said Smith County, Texas, is president and upon whom service can be had.

" 'Second. That heretofore, to wit, on or about the 26th and 29th days of October, 1900, and the 13th day of November, 1900, plaintiff, then doing business in the said city of Chicopee, offered and proposed to the defendants Newell W. White and A. Hicks, who were then doing business in the city of Tyler as partners, under the said firm name of Newell W. White & Company, to purchase from them certain bales of cotton at the prices hereinafter stated, to be delivered by the said defendants to plaintiff as follows, to wit: [Here follows number of bales and place of delivery, which it is not necessary to set out.]

" 'Which said offer and proposal so made by the plaintiff was on or about said above mentioned dates accepted by the defendants, and they then and there entered into a contract with the plaintiff whereby it was agreed that the said defendants should in the due course of trade and at as early date as possible deliver to the plaintiff at the above mentioned points said bales of cotton as above set out, and that the plaintiff was to pay the said defendants therefor upon the presentation to it of drafts with bills of lading attached thereto, showing that said cotton had been delivered to a carrier for transmission to plaintiff at said points the amounts above stated for each and every pound of cotton so delivered.

" 'Third. That said defendants Newell W. White & Company under said agreement and to the end of fulfilling the same, did on divers and sundry dates hereinafter shown deliver to the International & Great Northern Railroad Company, a common carrier, for transmission to plaintiff at said points of delivery certain bales of cotton, to wit: [Here follows detailed statement of several shipments.]

" 'And took and received from said carrier bills of lading in the name of Newell W. White & Company for each and all of said shipments, and said defendants having so received said bills of lading, drew sight drafts on plaintiff purporting to be for the amount of the purchase prices of said cotton, calculated upon the true weights thereof, less the freight charges and brokerage, which under the said contract were to be paid by the defendants and which for that reason were deducted from the purchase prices, the said drafts being payable to the order of Newell W. White & Company and being in amounts as follows, to wit: [Here follows detailed statement of the amounts of the various drafts.]

" 'Which said drafts, the said drafts being negotiable instruments, and said bills of lading were by said defendants indorsed in blank in the name of Newell W. White & Company and were transferred to and purchased by the defendants herein, the Citizens National Bank of Tyler, whereby the said bank became and was the owner of said drafts and bills of lading and of the cotton represented by said bills of lading, and whereby said bank undertook, promised and agreed and became bound unto the plaintiff to carry out and fulfill the defendants' Newell W. White & Company's said contract with plaintiff above set out.

" 'Fourth. The said bank having by the means aforesaid become the owner and holder and proper payee of said drafts and bills of lading and cotton aforesaid, forwarded the said drafts along with said bills of lading to its agents and correspondents for collection from the plaintiff, which said drafts and bills of lading accompanying the same reached plaintiff and were accepted and paid by plaintiff long prior to the time when said cotton which had been shipped by freight did or could have reached its destination, by reason of which plaintiff was forced to and did rely solely on defendant to deliver to it the amount of cotton represented by said draft with freight and brokerage added, at the purchase price herein shown and for which the plaintiff had paid them as aforesaid. And plaintiff believing that said drafts less said freight charges and brokerage represented the true amount of the purchase prices of said cotton calculated upon the true and correct weight thereof, paid said drafts, freight charges and brokerage before it could have examined or weighed said cotton, all of which the defendant well knew the plaintiff would be forced to do when they shipped said cotton and drew and discounted said drafts, and which was also shown to the said bank when it purchased said drafts and bills of lading, and it undertook to carry out said contract as aforesaid.

" 'Fifth. That the defendants Newell W. White and A. Hicks, contriving and fraudulently intending to deceive and defraud plaintiff in this behalf, did not deliver to it the amount of cotton in weight represented by the amount of said drafts, freight charges and brokerage, at said purchase prices, and which plaintiff had paid them for, but falsely made out said drafts for an amount grossly in excess of the amount they were entitled to receive from plaintiff calculated upon the true weight of said cotton, for the purpose of defrauding plaintiff as aforesaid, for all of which the defendant bank, by reason of its having purchased said drafts and bills of lading and become the owner of said cotton and undertaken to carry out said · contract is liable to plaintiff, while in truth and in fact the true weight of said cotton so shipped was only as follows, to wit: [Here follows statement of weights.]

" 'That had the said cotton been of a weight sufficient at said purchase prices to have made the amount of said drafts including all freight and brokerage the same would have been as follows, to wit: [Here follows statement of weights showing the shortage.]

" 'Which said difference in weight between the cotton actually delivered and the amount for which the plaintiff had paid said defendants as aforesaid at said purchase prices amounting to the sum of $3727.34, as is more particularly shown by the itemized statement which is hereto attached marked exhibit A for identification and made a part of this petition, which sum is $3727.30, the said Citizens National Bank of Tyler by the manner and means herein alleged has collected, had and received from plaintiff over and above the amount it was justly entitled to receive, and which it now still wrongfully withholds from the plaintiff,

and which amount the defendants, although often requested, have failed and refused and still fail and-refuse to pay, to plaintiff's great damage.

" 'Sixth. And plaintiff further alleges that if it be mistaken in its allegations that said Newell W. White and A. Hicks were partners and that said contract of sale was made and said drafts drawn on said cotton shipped and said drafts and bills of lading were transferred, sold and indorsed by them to defendant bank as partners, plaintiff alleges that all of said things were done and performed by one or both of them as individuals, and that the said Newell W. White was in and about said transaction doing business under the said name of Newell W. White & Company, and plaintiff alleges that it is unable here to state whether or not in said transaction the said Newell W. White and A. Hicks were partners or whether said acts and things herein alleged to have been done by them were done as individuals or done by them jointly or severally, for the reason that the knowledge of the true nature and manner of said transaction is unknown to plaintiff and can not be ascertained by it and is peculiarly within the knowledge of the said defendants, Newell W. White and A. Hicks.

" 'Wherefore the premises considered plaintiff sues and prays that, defendants having been duly cited, that upon final hearing it have judgment against all of the aforesaid defendants for the amount of its said damages, for costs of suit, and for all such other and further orders, judgments and decrees as it may be entitled to under the law and the facts, both generally and specially, both in law and equity, and in duty bound will ever pray.'

"We respectfully propound for your decision the question: Did the trial court err in sustaining the general demurrer?"

The action appears to be founded on the idea that by the transactions alleged the bank became a party to the contract of sale between plaintiff and White & Company, bound to perform the undertakings of the latter, and therefore liable for the violation of their agreement. It is not averred that the bank was a party to or had notice of the fraud charged against White & Company, or was guilty of any negligence or misrepresentation, or in any way deceived plaintiff, and hence the action can not be maintained as for deceit, fraud or negligence on part of the bank.

The theory of the plaintiff is supported by the decision of the Court of Civil Appeals for the Third District in the case of Landa v. Lattin, 19 Texas Civ. App., 246, which was followed by the Supreme Court of North Carolina in the case of Finch v. Gregg, 49 Law. Rep. Ann., 679. We understand the courts to hold in those cases that a purchaser of such drafts and bills of lading is substituted, by the mere purchase, in the place of the vendor in the contract of sale, becomes bound to perform that contract as a condition precedent to his right to the price of the goods represented by the bill of lading; and that, therefore, although the drafts be actually accepted and paid by the drawee, if the consideration which he was to receive from the drawee fails, the price may be recovered from the holder to whom the payment has been made. It is

undoubtedly true that the purchaser acquires by his purchase no greater rights than the drawer has against the drawee. The attitude of the latter is, so far, unchanged, and he is no further bound to the purchaser than he would be bound to the drawer to accept or pay; but we do not agree that the purchaser becomes bound to perform the contract of the vendor, nor that, when the bill of exchange is subsequently accepted or paid, he acquires no additional right against the acceptor or payor. Transactions of this kind have often come before the courts and we understand the rule of the commercial law to be thoroughly established, that one who has accepted or paid a bill of exchange drawn upon him, can not defeat his acceptance or recover the money paid because there was no consideration, or the consideration has failed, as between him and the drawer, when the payee bought from the latter, for value, without notice of the defense. The leading cases on the subject have arisen where bills of lading for goods were forged and attached to drafts drawn for the prices of the goods, negotiated with banks, and forwarded to and accepted or paid by the drawees, without knowledge on the part of either holder or drawee of the forgery. Efforts of the aceptors to avoid liability on aceptances and of payors to recover the money so paid have been defeated, both in courts of law and of equity. Hoffman & Co. v. Bank of Milwaukee, 12 Wall., 181; Goetz v. Bank of Kansas City, 119 U. S., 551; Robinson v. Reynolds, 2 Adolph & Ellis (U. S.), 196; Thiedemann v. Goldschmidt, 1 De G. F. & J., 4; 1 Daniel on Neg., Inst., secs. 174, 175, and notes; Marsh v. Low, 55 Ind., 271. Other authorities are cited in those referred to.

In Thiedemann v. Goldschmidt, Lord Campbell said: "I think that dangerous consequences would follow, and the credit of bills of exchange be very much shaken, if the title of the indorsees of bills of exchange, as against the acceptor, under such circumstances, could be called in question. It is allowed that the case of Robinson v. Reynolds was well decided, that its authority has never been questioned, and that it is a part of the commercial law of England." After further discussing the cases, he says: "It must be considered that the bills were accepted by Thiedemann (the drawee) on the credit of Homeyer (the drawer and forger), and for that reason it would be alarming if the title of the indorsees (they holding the bills bona fide for value) could be thus impeached."

In the case of Hoffman & Co. v. Bank, supra, the Supreme Court of the United States thus states the doctrine: "Money paid under a mistake of facts, it is said, may be recovered back as having been paid without consideration, but the decisive answer to that suggestion, as applied to the case before the court, is that money paid, as in this case, by the acceptor of a bill of exchange to the payee of the same, or to a subsequent indorsee, in discharge of his legal obligation as such, is not a payment by mistake nor without consideration, unless it be shown that the instrument was fraudulent in its inception, or that the consideration was illegal, or that the facts and circumstances which impeach the transac-

tion, as between the acceptor and the drawer, were known to the payee or subsequent indorsee at the time he became the holder of the instru-ment. * * * Different rules apply between the immediate parties to a bill of exchange—as between the drawer and the acceptor, or between the payee and the drawer—as the only consideration as between those parties is that which moves from the plaintiff to the defendant; and the rule is, if that consideration fails, proof of that fact is a good defense to the action. But the rule is otherwise between the remote parties to the bill, as, for example, between the payee and the acceptor, or between the indorsee and the acceptor, as two distinct considerations come in question in every such case where the payee or indorsee became the holder of the bill before it was overdue and without any knowledge of the facts and circumstances which impeach the title as between the immediate parties to the instrument. Those two considerations are as follows: first, that which the defendant received for his liability, and secondly, that which the plaintiff gave for his title, and the rule is well settled that the action between the remote parties to the bill will not be defeated unless there be an absence or failure of both these considerations. Unless both considerations fail in a suit by the payee against the acceptor, it is clear that the action may be maintained, and many decided cases affirm the rule, where the suit is in the name of a remote indorsee against the acceptor, that if any intermediate holder between the defendant and the plaintiff gave value for the bill, such an intervening consideration will sustain the title of the plaintiff."

It is claimed that the allegation in this case, that, not only the drafts but the bills of lading were purchased by the bank, distinguishes it from those cited where the bills merely accompanied the drafts as security. The *facts* alleged in the petition do not show this to have been other than the common transaction in which money is paid for drafts accompanied by bills of lading, representing the goods consigned as security. The allegation is that the drafts and bills of lading were indorsed in blank and were transferred to and purchased by the bank. The conclusion from these facts is then stated: "whereby said bank became and was the owner of said drafts and bills of lading and of the cotton represented." This is only a conclusion from the facts previously stated and can not be held to enlarge the legal effect of those facts. The drafts were for the price of cotton which the drawer was under obligation to deliver to the drawee on payment. The bank's right was therefore only to receive the amount called for by the drafts and, on payment thereof, it was bound to deliver to the payor the bills of lading representing the cotton. The bank became the owner, only as the facts alleged made it the owner, of the cotton; and this was only in the limited sense that it could hold and control the cotton until the drafts were paid, and as a means of insuring payment or recovering loss. No contract or agreement of the bank, either with the drawer or drawee, is alleged to make its relation to the contract of sale other than that which resulted from the simple fact that the drafts for the price of the cotton and the bills of lading were

purchased by it from the vendors of the cotton. The concluding language in the fourth and fifth paragraphs of the petition, referring to the undertaking of the bank to carry out the contract, does not charge nor, as we construe the pleading, intend to charge, that the bank affirmatively agreed to carry out the contract, but states, as the pleader's construction of the facts alleged, that such undertaking arose from the purchase, as held in Landa v. Lattin. Necessarily, the legal effect of the transaction stated between the bank and White & Company was only to entitle the former to collect, either from the drawee or, in case of its refusal to pay, from the drawers, the money called for by the drafts, and, to secure this right, a limited ownership and control of the cotton was conferred by the indorsement and delivery of the bills of lading. Such is the legal effect of the facts alleged, and such was the legal effect of the transactions passed upon in the authorities cited; and those decisions clearly control this case. It was as true in those cases, as it is in this, that the purchasers of the bills of exchange secured by the bills of lading originally acquired only such rights against the drawees as the drawers had against them, and that, in order to put the holders in a position to require acceptance or payment of the bills of exchange, performance of the contract of sale by the drawers was essential; and it is equally true in this case, as it was in those, that, in payng the drafts, the drawees, acting on the credit of the drawers and not of the holder, became bound to the latter, and that a failure of the consideration moving from the drawers to the drawee can not affect the rights of the payee thus acquired in good faith upon a consideration moving from itself to the drawers.

The latest decision called to our attention is that of the Supreme Court of Iowa in the case of Tolerton & Stetson v. Anglo-California Bank, 50 Law. Rep. Ann., 777, in which the court, after discussing Landa v. Lattin and Finch v. Gregg, enunciates what we regard as the correct rule.

The decisions referred to are wholly inconsistent with the theory that in such a transaction the purchaser of the draft and bill of lading becomes substituted for the vendor to such extent that he assumes the obligations of his contract with the vendee. This is not true of assignees generally. While an assignee may not by his assignment acquire any right against the party against whom the claim is asserted, he does not, by taking the assignment merely, assume the obligations of the assignor. The true question in such cases is whether or not money so paid upon bills of exchange can be recovered as having been paid by mistake, which is negatived by the rules of the law merchant; and not whether or not there has been a breach of contract by the holder, who never has a contract with the drawee of the bill of exchange until the latter honors it.

We answer that the court did not err in sustaining the general demurrer.